# UNITED STATES DISTRICT COURT
## NOTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

FILED

16 NOV 14  PM 2:58

1:16CV 388

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ) | Case No._____ |
| JESSICA HANNIE ) | |
| ) | (Judge _RL_____ ) |
| and ) | |
| ) | **COMPLAINT AND JURY DEMAND** |
| THE STATE OF FLORIDA, THE STATE ) | |
| OF GEORGIA, THE STATE OF ) | |
| INDIANA, THE STATE OF MARYLAND,) | **TO BE FILED UNDER SEAL** |
| THE STATE OF NORTH CAROLINA, ) | |
| THE STATE OF TENNESSEE, AND THE ) | **DO NOT SERVE** |
| COMMONWEALTH OF VIRGINIA, *ex* ) | |
| *rel.* JESSICA HANNIE ) | |
| ) | |
| Relator/Plaintiffs, ) | |
| ) | |
| -v- ) | |
| ) | |
| SIGNATURE HEALTHCARE, LLC ) | |
| 12201 Bluegrass Parkway ) | |
| Louisville, KY 40299-2361 ) | |
| ) | |
| Defendant. ) | |

2

## I.     **INTRODUCTION**

This is an action by *qui tam* Relator Jessica Hannie ("Relator" or "Ms. Hannie") through the undersigned counsel, made on behalf of herself and the United States of America ("United States") and the State of Florida, the State of Georgia, the State of Indiana, the State of Maryland, the State of North Carolina, the State of Tennessee, and the Commonwealth of Virginia (the "States") to recover damages and penalties arising from the fraudulent conduct of Defendant Signature HealthCare, LLC, by and through its subsidiaries and affiliates (collectively "Defendant") for using, making, presenting or causing to present false statements and claims to the government in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq.* and the various False Claims Acts of each listed state (collectively, the "False Claims Act").

Defendant's unlawful and fraudulent scheme is straightforward: at the Signature HealthCARE facility in Fort Wayne, Indiana ("Signature Health – Fort Wayne") as well as at the other nursing facilities owned and operated by Signature HealthCARE, LLC around the country, Defendant: (a) routinely and repeatedly admits and bills the government for nursing facility services administered to individuals without first conducting preadmission screenings of the individuals, as explicitly required under federal law, and (b) knowingly admits and retains residents that do not qualify for institutional care at a nursing facility, then fraudulently and wrongfully bills the government for all of the medically unnecessary services provided.

Since at least 2010 and continuing to the present, Defendant has wrongfully and knowingly billed government healthcare programs, such as Medicare, Medicaid, TRICARE/CHAMPUS, Blue Cross/Blue Shield – CHIP, and Veterans Administration ("VA") (collectively, "Medicare"), for medically unnecessary services in violation of 42 U.S.C. § 1395y(a)(1)(A) and other federal and state regulations. Upon information and belief, it is

3

estimated that the Signature Health – Fort Wayne location *alone* wrongfully pocketed more than $5,000,000 from Medicare *in 2015*. Signature Health – Fort Wayne is one of **143 locations** that Defendant owns and operates, so the damages for the unlawful conduct nationwide may easily be in excess of $100 million.

Under the terms of the False Claims Act, this Complaint is to be filed in camera and under seal and is to remain under seal for a period of at least sixty days and shall not be served on Defendant until the Court so orders. The Government may elect to intervene and proceed with the action within the sixty-day time frame, or within any extensions of that initial sixty-day period granted by the Court for good cause shown, after it receives both the Complaint and the Material Evidence submitted to it.

For her cause of action, the Relator alleges as follows:

## II.   NATURE OF THE ACTION

1.   This is an action to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733.

2.   Under the False Claims Act, a private person may bring an action in federal district court for herself and for the United States, and may share in any recovery. 31 U.S.C. § 3730(b). That private person is known as a "Relator" and the action that the Relator brings is called a *qui tam* action.

## III.   JURISDICTION AND VENUE

3.   This Court has subject matter jurisdiction to adjudicate this action under 28 U.S.C. §§ 1331 and 1345.

4.   This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant transacts and has transacted business in this District.

4

5.      Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because Defendant is located in and transacts business in this District.

## IV.    **PARTIES**

6.      The Relator brings this action on behalf of the United States, including its agency, the Department of Health and Human Services ("HHS"), its component, the Centers for Medicare & Medicaid Services ("CMS," formerly the Health Care Financing Administration ("HCFA")), and all other government healthcare programs, such as Medicaid, TRICARE/CHAMPUS, Blue Cross/Blue Shield – CHIP, and Veterans Administration ("VA") and all other Government programs. All of the federal Government entities and programs are collectively referred to as "Medicare" or the "United States" for drafting convenience.

7.      The Relator also brings this action on behalf of the State of Florida, the State of Georgia, the State of Indiana, the State of Maryland, the State of North Carolina, the State of Tennessee, and the Commonwealth of Virginia, including all counterpart agencies to the federal agencies referenced above. They are collectively referred to as "the States."

8.      The Relator also brings this action on behalf of herself, as permitted under the False Claims Act. Relator Jessica Hannie is a citizen of the United States and a resident of the State of Indiana. Until her recent termination, Relator Jessica Hannie was employed for two years as a Minimum Data Set ("MDS") Coordinator and Case Manager for Signature Health – Fort Wayne.

9.      In her role as MDS Coordinator and Case Manager, Relator observed the fraudulent scheme instigated by Signature Health – Fort Wayne, including (a) improperly admitting patients who are unqualified for admission and whose admission is expressly prohibited by Federal law, and (b) thereafter fraudulently submitting claims for Medicare

reimbursement that include medically unnecessary expenses and prohibited costs incurred in providing nursing services to the unqualified and prohibited individuals. Through her role as MDS Coordinator and Case Manager, Ms. Hannie has direct and independent knowledge of the information on which the allegations set forth in this Complaint are based. Ms. Hannie is the original source of these allegations. Ms. Hannie has knowledge of the false claims and records that Defendant knowingly, falsely and fraudulently submitted to the federal government as alleged herein.

10.     Defendant Signature HealthCARE, LLC ("Signature Health"), is a limited liability company organized under the laws of Delaware with its principal office located at 12201 Bluegrass Parkway, Louisville, KY 40601. Signature Health's principal business is as a long-term health care and rehabilitation company.

11.     Upon information and belief, the fraudulent scheme extends not only to Signature Health's eight other Medicare-certified nursing facilities in **Indiana** (Signature HealthCARE of Bluffton, Signature HealthCARE of Bremen, Signature HealthCARE of Lafayette, Signature HealthCARE of Muncie, Signature HealthCARE of Newburgh, Signature HealthCARE of Parkwood, Signature HealthCARE of South Bend, and Signature HealthCARE of Terre Haute), but also to all of Signature Health's facilities in the ten other states in which it operates, including:

        a. **Alabama**: Signature HealthCARE of Whitesburg Gardens,

        b. **Florida**: Washington Rehabilitation and Nursing Center, Pinellas Park Care and Rehabilitation Center, Signature HealthCARE of North Florida, Anchor Care and Rehabilitation Center, Signature HealthCARE of Ormond, Southern Pines Healthcare Center, Signature HealthCARE of Port Charlotte, Signature HealthCARE of Brookwood Gardens, Winter Park Care & Rehabilitation Center, Signature HealthCARE of Orange Park, Peninsula Care & Rehabilitation Center, Kenilworth Care and Rehabilitation Center, Signature HealthCARE at College Park, The Bridge at Bay St. Joe, Signature HealthCARE Center of Waterford, Signature HealthCARE of Gainesville,

Golfview Healthcare Center, Signature HealthCARE at The Courtyard, Chautauqua Rehabilitation & Nursing Center, Golfcrest Healthcare Center, Heritage Park Care and Rehabilitation Center, Signature HealthCARE of Palm Beach, Signature HealthCARE of Jacksonville, Surrey Place Care Center, Gulfport Rehabilitation Center, Signature HomeNow Lakeland, Signature HomeNow Sebring, Signature HomeNow Port Charlotte, Signature HomeNow Fort Myers, Signature HomeNow Ocala, Signature HomeNow Longwood, Signature HomeNow Rockledge, Signature HomeNow Jensen Beach, Signature HomeNow Jacksonville, Signature HomeNow Ormond Beach, Community Home Health, and Northwest Florida Community,

c. **Georgia**:   Signature HealthCARE of Marietta, Signature HealthCARE of Buckhead, Signature HeathCARE at Tower Road, and Signature HealthCARE of Savannah,

d. **Kentucky**:  Signature HealthCARE of South Louisville, Rockcastle Health & Rehabilitation Center, Signature HealthCARE of Georgetown, Hermitage Care and Rehabilitation Center, Riverview Health Care Center, Signature HealthCARE of Trimble County, Clinton County Care & Rehabilitation Center, Morgantown Care & Rehabilitation Center, Signature HealthCARE of East Louisville, Signature HealthCARE of Spencer County, Prestonburg Health Care Center, Lee County Care & Rehabilitation Center, Bracken County Nursing & Rehabilitation Center, Mayfair Manor, Bluegrass Care & Rehabilitation, Signature HealthCARE of Pikeville, Signature HealthCARE of Cherokee Park, Signature HealthCARE of Sunrise Manor, Signature HealthCARE at Hillcrest, Riverside Care & Rehabilitation Center, Danville Centre for Health and Rehabilitation, Signature HealthCARE of Bowling Green, Harrodsburg Health & Rehabilitation Center, Signature HealthCARE of Elizabethtown, Sts. Mary & Elizabeth Excelerated Care Unit, Liberty Care & Rehabilitation Center, Fountain Circle Care and Rehabilitation Center, Oakview Nursing and Rehabilitation Center, Signature HealthCARE at Glenview, Signature HealthCARE of Glasgow Rehab & Wellness Center, Signature HealthCARE at Colonial Rehab & Wellness Center, Signature HealthCARE of Carrollton Rehab & Wellness Center, Signature HealthCARE of Hart County Rehab & Wellness Center, Signature HealthCARE at Heritage Hall Rehab & Wellness Center, Signature HealthCARE at Jefferson Manor Rehab & Wellness Center, Signature HealthCARE at Jefferson Place Rehab & Wellness Center, Signature HealthCARE at Meadowview Rehab & Wellness Center, Signature HealthCARE at Rockford Rehab & Wellness Center, Signature HealthCARE at Summerfield Rehab & Wellness Center, Signature HealthCARE at Tanbark Rehab & Wellness Center, Signature HealthCARE at North Hardin Rehab & Wellness Center, Signature HealthCARE of McCreary County Rehab & Wellness Center, Signature HealthCARE of Monroe County Rehab & Wellness Center, Signature HealthCARE of Hartford Rehab & Wellness Center, Signature HealthCARE at Summit Manor Rehab & Wellness Center, and Signature HealthCARE at Jackson Manor Rehab & Wellness Center,

7

    e.  **Maryland**: Signature HealthCARE at Mallard Bay, and Chesapeake Shores,

    f.  **North Carolina**: Signature HealthCARE of Roanoke Rapids, Signature HealthCARE of Kinston, Gastonia Care and Rehabilitation, Signature HealthCARE of Chapel Hill, Creekside Care & Rehabilitation Center, and Scotland Manor Health Care Center,

    g.  **Ohio**: Signature HealthCARE of Coshocton, Signature HealthCARE of Chillicothe, Signature HealthCARE of Warren, Signature HealthCare of Galion, and Signature HealthCare of Fayette County,

    h.  **Pennsylvania**: Signature HealthCARE of Bloomsburg Rehab & Wellness Center,

    i.  **Tennessee**: Signature HealthCARE of Primacy, Signature HealthCARE of Cleveland, Signature HealthCARE of Clarksville, Harriman Care & Rehabilitation Center, Signature HealthCARE of Columbia, Signature HealthCARE of Greeneville, Signature HealthCARE of Fentress County, Pickett Care and Rehabilitation Center, Signature HealthCARE of Memphis, Signature HealthCARE of Erin, Pine Ridge Care & Rehabilitation Center, Signature HealthCare at St. Peter Villa, The Bridge at Monteagle, Standing Stone Care and Rehabilitation Center, Mountain City Care & Rehabilitation Center, Pigeon Forge Care & Rehabilitation Center, The Bridge at Highland, The Bridge at Ridgely, The Bridge at Rockwood, Signature HealthCARE of Rogersville, The Bridge at South Pittsburg, Spring City Care and Rehabilitation Center, Westmoreland Care & Rehabilitation Center, Signature HealthCARE at Saint Francis, Signature HealthCARE of Madison, Nashville Community Care & Rehabilitation Center at Bordeaux, Signature HealthCARE of Putnam County, Signature HealthCARE of Nashville, and Signature HealthCARE at Methodist, and

    j.  **Virginia**: Signature HealthCARE of Norfolk.

## V.    LEGAL FRAMEWORK

### A.    The Medicare & Medicaid Programs

    12.    The Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program, was created in 1965 as part of the Social Security Act ("SSA"). The Secretary of Health and Human Services ("HHS") administers the Medicare program through the Health Care Financing Administration ("HCFA"), a component of HHS.

    13.    Congress enacted Title XVIII of the Social Security Act to pay the costs of certain health care services for eligible individuals. 42 U.S.C. §§ 1395 *et seq.*

14.     HHS is an agency of the United States whose activities, operations, and contracts are paid from federal funds.  CMS is a division of HHS that is responsible for the administration and supervision of the Medicare program.

15.     Medicare is a 100% federally subsidized health-insurance system for eligible Americans, including those aged 65 and older, certain disabled people, and certain people with chronic diseases who elect coverage.  42 U.S.C. § 1395c.  *See* 42 U.S.C. §§ 1395j-1395w. Medicare Part A provides coverage for inpatient hospital costs, services rendered by skilled nursing facilities, home health care, and hospice care.  42 U.S.C. §§ 1395(k), 1395(i), 1395(s). Part B provides coverage for physician services, outpatient hospital care, physical therapy, and other miscellaneous medical equipment and supplies.  *See* 42 U.S.C. §§ 1395j-1395w-4.

16.     Medicare Part B covers some medical services and supplies that Medicare Part A does not cover.  Under the terms and policies of insurance, Medicare only provides benefits for medically necessary services rendered by eligible and appropriately licensed providers.  *See* 42 U.S.C. § 1395y(a)(1)(A).  Medicare has no obligation to pay claims or provide benefits for unnecessary services.

17.     To participate in Medicare, a provider must sign and file a Provider Agreement with CMS promising compliance with applicable statutes, regulations, and guidance.  42 U.S.C. § 1395cc; 42 C.F.R. § 412.23(e)(1).  Medicare service providers, such as Defendant, have a legal duty to familiarize themselves with Medicare's reimbursement rules, including those delineated in the Medicare Manuals.  *Heckler v. Cmty. Health Serv. of Crawford Co., Inc.,* 467 U.S. 51, 64-65 (1984).

18.     Reimbursement for Medicare claims is made by the United States through HHS. CMS is an agency of HHS and is directly responsible for the administration of the Medicare

program. CMS, in turn, contracts with private insurance carriers to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the carriers act on behalf of CMS. 42 C.F.R. § 421.5(b). These entities are called fiscal intermediaries. Claims submitted for reimbursement are to be paid in accordance with the Social Security Act, Code of Federal Regulations, and Medicare Rules and Regulations promulgated by CMS.

19. Medicaid is a joint federal-state program that pays for health care services, including nursing facility services, for low-income individuals, including pregnant women, children, and parents and other caretaker relatives, as well as elderly and disabled individuals. As a result of the Affordable Care Act ("ACA"), each state has the option to expand eligibility for Medicaid beginning in calendar year 2014 to all nonelderly adults with income below 138 percent of the federal poverty guidelines.

20. Medicaid is jointly funded by the states and Federal governments. The federal government's share of each state's Medicaid spending, known as the Federal Medical Assistance Percentage ("FMAP"), is based upon the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Such share must be at least 50 percent, but no more than 83 percent, and historically has averaged about 57 percent. In other words, the Federal Government guarantees to match at least $1 in federal funds for every $1 any individual state spends on its Medicaid program. The FMAP for the State of Indiana for the 2017 fiscal, for example, is 66.28%. Meaning that for every $1 the State of Indiana allocates to its Medicaid program, the Federal Government will match an additional $2.01.

21. In addition, Medicaid provides higher, enhanced matching rates for select services or populations. As part of the ACA's coverage expansion beginning in calendar year 2014, the federal government will pay 100% of the costs of covering newly eligible enrollees. From 2017

to 2020, the federal share for newly eligible enrollee coverage will decline gradually to 90% and remain at that percentage thereafter.

22.      State Medicaid programs must comply with the minimum requirements set forth in the federal Medicaid statute to qualify for federal funding. 42 U.S.C. § 1396a. Federal funds regularly account for the majority of each state's Medicaid funding. Indeed, Medicaid is the third largest domestic program in the federal budget following Medicare and Social Security. In the 2014 federal fiscal year, for example, Medicaid accounted for 9% of federal spending. Medicaid is the largest source of federal funds spent by the states; 48% of all federal funds spent by states come from the Medicaid program.

23.      The Medicaid programs of all states reimburse for nursing facility services. Most states contract with private companies for the evaluation and processing of claims submitted for reimbursement under the Medicaid program. Generally speaking, a nursing facility will submit claims for reimbursement electronically to the private company, which will then process the claims, and either pay the claims on behalf of the state or provide the necessary information to the state to enable the state to pay the claims. On a quarterly basis, each state will submit a claim to the HHS for payment of the federal share of the state's Medicaid spending, including nursing facility reimbursements.

24.      By participating as a Medicaid-certified nursing facility in the Medicaid program, nursing facilities, such as Signature Health – Fort Wayne, are charged with actual notice and knowledge of the federal and state statutes, regulations, and rules applicable to the Medicaid program, and have consented to compliance with all such statutes, regulations, and rules, including those governing reimbursement.

11

**B.**     **Nursing Facilities Must Conduct Preadmission Screening To Be Eligible For Medicaid Reimbursement**

25.     In 1987, Congress enacted the Nursing Home Restoration Act ("NHRA") to stop the practice of inappropriately placing persons with intellectual disabilities and related conditions in nursing facilities without providing services for their unique needs. 42 U.S.C. § 1396r, *et seq.*

26.     Pursuant to the NHRA, nursing facilities have an in-depth, strict set of requirements relating to the provision of services, including "promoting the maintenance or enhancement of the quality of life of each resident," "maintain[ing] the highest practicable physical, mental, and psychosocial well being of each resident," and "conduct[ing] a comprehensive, accurate, standardized, reproducible assessment of each resident's functional capacity." 42 U.S.C. § 1396r(b)(1)–(3). The NHRA requires nursing facilities to be in full legal compliance, explicitly stating that "[a] nursing facility must operate and provide services in compliance with all applicable Federal, State, and local laws and regulations . . . ." 42 U.S.C. § 1396r(d)(4)(A).

27.     To properly fulfill the function of comprehensively and accurately assessing each resident's functional capacity, the NHRA expressly **requires all nursing facilities to conduct a preadmission screening of every new resident prior to admission into the nursing facility**. 42 U.S.C. § 1396r(b)(3)(F). This express requirement is commonly referred to as "PASRR" or "PAS Approval." In the clearest of terms, the NHRA states as follows:

> [A] nursing facility *must not admit* . . . *any new resident* . . . *unless* the State mental health authority has *determined* . . . *prior to admission* that . . . the individual requires the level of services provided by a nursing facility.

42 U.S.C § 1396r(b)(3)(F). The requirement that nursing facilities conduct a preadmission screening of all new residents prior to admission *applies to all potential residents*, regardless whether or not they are Medicaid-eligible. 57 Fed. Reg. 56450, 56452 (Nov. 30, 1992).

28.     The purpose of PASRR is to ensure the appropriate placement of individuals in nursing facilities by determining, prior to admission, whether or not an individual has a serious mental illness and/or intellectual disability, and, if so, whether such illness/disability requires the services provided by the facility or certain specialized services.  42 U.S.C. § 1396r(b)(3)(F)(i)–(ii); 42 C.F.R. §§ 483.112–483.128(a).  Indeed, PASRR is an important tool for states to use in rebalancing services away from institutions and towards supporting people in their homes, as well as to comply with the Supreme Court's holding that, under the Americans with Disabilities Act, individuals with disabilities cannot be required to be institutionalized to receive public benefits that could otherwise be furnished in community-based settings.  *See Olmstead v. L.C. by Zimring*, 527 U.S. 581, 587 (1999).

29.     **The failure to conduct preadmission screenings is a failure to determine whether individuals should receive nursing facility services**.  When a nursing facility fails to conduct a preadmission screen, it fails to determine whether an individual has a serious mental illness and/or intellectual disability.  Conversely, a failure to conduct a preadmission screen is also a failure to validate that an individual is without any mental illness and/or intellectual disability.  In either instance, no determination is made for whether institutionalization in a nursing facility is appropriate for the individual.

30.     A determination of a mental illness and/or intellectual disability is never sufficient by itself to warrant admission into a nursing facility.  PASRR addresses not just whether an individual needs nursing facility level of care, but also whether the particular nursing facility in questions can meet the individual's total needs, or whether the individual is better served by home and community-based services.

31.     Under the aforementioned Federal statutes and the Supreme Court's holding in

13

*Olmstead v. L.C. by Zimring*, 527 U.S. 581, 587 (1999), these determinations **cannot be made ex post facto**. Without a preadmission screening, an individual's institutionalization at the nursing facility is forever improper.

32.     Accordingly, a nursing facility's **failure to perform the required preadmission screening of all new residents renders the nursing facility disqualified from receiving Medicaid reimbursement** for services provided to individuals without PAS Approval.   42 U.S.C. § 1396r(e)(7)(D).  Indeed, the NHRA expressly states:

> For failure to conduct preadmission screening or review. *No payment may be made* . . . with respect to nursing facility services furnished to an individual for whom a determination is required . . . but for whom the determination was not made.

42 U.S.C. § 1396r(e)(7)(D)(i)–(ii).

33.     Various states recognize that submitting claims for government reimbursement when failing to conduct preadmission screening creates liability under federal and state False Claims Act statutes.  For example, Tennessee's PASRR Form, titled "Tennessee Screening for Mental Illness and/or Intellectual Disability," certifies that PASRR evaluation has been performed, that the information on the form "will be used to determine the patient's eligibility for nursing facility care."  The certification statement further states that under the False Claims Act "any person who presents, or causes to be presented, to the State, a claim for payment under the TennCare program knowing such claim is false or fraudulent is subject to federal and State civil and criminal penalties."[1]

### C.     Preadmission Screening and Assessments Required To Determine What Services Are Medically Necessary

34.     Medicare only reimburses providers for providing services that are medically reasonable and necessary for medical diagnosis and treatment.  42 U.S.C. § 1395y.

---

[1]  Signature Health operates over thirty facilities in Tennessee.

35.     Likewise, a state's Medicaid program reimburses only for medically necessary services.  42 U.S.C. § 1396a(a); *e.g.*, *Moore v. Reese*, 637 F.3d 1220, 1233 (11th Cir. 2011) ("participating states must provide those medical services or treatments for Medicaid recipients *only if they are medically necessary*") (emphasis added) (internal quotations omitted); *see also* 42 C.F.R. § 440.230(d) (discussing limitations based on services that are medically necessary).  Although  the standard for what is medically necessary is not expressly stated in the Medicaid statute, it has become "a judicially accepted component of the federal legislative scheme." *Moore*, 537 F.3d at 1233.

36.     Under the Medicare statute, nursing facilities are required to regularly conduct comprehensive, accurate, standardized, reproducible assessments of each residents functioning capacity upon admission into the nursing facility.  42 U.S.C. § 1395i-3(b)(3)(A)–(C).  Federal law requires the nursing facility to conduct the assessment in coordination with the preadmission screenings required by Medicaid.  42 U.S.C. § 1396i-3(b)(3)(E).

37.     Preadmission Screenings and Assessments are required for new residents in order to determine and develop an individual's plan of care at the nursing facility, as well as the scope of services necessary under the care plan.  Admitting an individual to a nursing facility without conducting the required Preadmission Screenings and Assessments means that the nursing facility has not determined what services are medically necessary for that individual.  Without a determination of medical necessity upon admission, services provided to that individual thereafter are *per se* medically unnecessary.

38.     In order to bill Medicare, a provider must submit a form called the CMS 1500. The form describes, among other things, the provider, the patient, the referring physician, the services provided by procedure code, the related diagnosis code(s), the dates of service, and the

amounts charged. The provider certifies on the CMS 1500 claim that the information provided is truthful and that the services billed on the form were "medically indicated and necessary."

39.     In order to receive reimbursement from Medicaid, a provider must submit a signed claims form to the state's Medicaid program, certifying that the information on the form is "true, accurate, and complete. 42 C.F.R. § 455.18. The provider further certifies that it "understand[s] that payment of this claim will be from Federal and State funds, and that nay falsification, or concealment of a material fact, may be prosecuted under Federal and State laws." *Id.*

40.     In paying health insurance claims and determining whether services are eligible for reimbursement, Medicare and Medicaid relies upon health insurance claims submitted by medical service providers, like Defendant Signature Health.

41.     Seeking payment, whether via Medicare or Medicaid, for medically unnecessary services is an act designed to obtain reimbursement for a service that is not warranted by the patient's current and documented medical condition. *See* 42 U.S.C. § 1395y(a)(l)(A); 42 C.F.R. § 455, *et seq.*

## VI.     **FACTUAL ALLEGATIONS**

42.     Since at least October 2014 when Relator began working as an MDS Coordinator and Case Manager at Signature Health – Fort Wayne, but upon information and belief dating back to at least 2010, Signature Health – Fort Wayne has designed and implemented an unlawful scheme to defraud Medicare by submitting, and by causing others to submit, false and fraudulent claims for ineligible and medically unnecessary nursing facility services. Specifically, the fraudulent scheme at Signature Health – Fort Wayne **alone** involves wrongfully billing Medicare for ineligible and unnecessary nursing facility services that cost approximately **$20,000** *per*

*patient per month*, when those patients were not permitted under federal law to be admitted into the nursing facility in the first place.

43.     Upon information and belief, this *same fraudulent conduct* has also been occurring at Signature Health's *143 locations* in Alabama, Florida, Georgia, Indiana, Kentucky, Maryland, North Carolina, Ohio, Pennsylvania, Tennessee, and Virginia.

44.     As an MDS Coordinator and Case Manager at Signature Health – Fort Wayne, Relator was tasked to ensure that patient services were well-documented, particularly during the assessment phases, such as preadmissions screenings. These assessments served to determine the level of reimbursement for the individual. Relator also worked hand-in-hand with doctors, residents, healthcare providers, and caretakers to use the assessment and screening details to formulate the best treatment plan and procedure for each individual resident at the nursing facility.

45.     During the course of her employment, Relator discovered that Signature Health – Fort Wayne was knowingly, with deliberate ignorance, or with reckless disregard, failing to conduct preadmission screenings of all new residents to its nursing facility as required by federal law, yet submitting Medicare claims for reimbursement for the costs incurred in providing nursing facility services to these same prohibited individuals.

46.     Relator's discovery of Signature Health – Fort Wayne's fraudulent conduct spawned from a May 2016 MDS training seminar at the Signature Health – Fort Wayne facility. Attendees at the seminar were instructed on how to determine each resident's level of reimbursement through their private health insurance based on what medications and treatments they were on, the amount of therapy they were receiving, and other insurance information that could be obtained in their patient files.

17

47.     After the seminar, Relator, in her role as MDS Coordinator and Case Manager, was granted access to internal resident files to review the reimbursement level for each resident. Through her own analysis of patient files, Relator believed that she discovered improper classification levels for a handful of patients at the facility.  To verify the classification levels, on June 2, 2016, Relator emailed her findings to the regional Business Operations Manager, Jane Doe 1, and the Clinical Reimbursement Projects Consultant, Jane Doe 2.  Both Jane Doe 1 and Jane Doe 2 responded to Relator positively, thanking her for looking into the issue and explaining that they would be back in touch to let her know whether her analysis was correct.

48.     Also in June 2016, the Director of Admissions, Jane Doe 3, relayed Relator's findings regarding the reimbursement levels to the Signature Health – Fort Wayne Administrator, John Doe 1.  John Doe 1 requested to meet with Jane Doe 3 and Relator to discuss Relator's findings.  Relator gave John Doe 1 the notes she had taken regarding the reimbursement levels.  During this same meeting, Jane Doe 3 shared with John Doe 1 that the facility was also missing PAS Approval paperwork for many residents.

49.     John Doe 1 requested Jane Doe 3, Relator and the Marketing Director, Jane Doe 4, conduct a full internal audit of current residents at the Signature Health – Fort Wayne facility to determine whether each resident had proper PAS Approval paperwork.

50.     The internal audit took approximately two days to complete.  The results of the audit showed that many residents had no PAS Approval paperwork at all, and for those that did, many had PAS Approval that had expired.  Relator found that residents either did not receive a preadmission screening prior to admission at all and were therefore entirely without PAS Approval, or had received approval for a limited number of days, but retained residency beyond the limited duration.

51.     For *both* sets of residents (those without PAS Approval and those with expired PAS Approval), however, Signature Health – Fort Wayne continued to improperly bill Medicare for services provided to them, including residents who resided at the facility for consecutive years without proper approval.  Of the approximately seventy resident files, Relator's internal audit concluded that Signature Health – Fort Wayne wrongfully billed Medicare for services administered to *at least twenty-four residents* who lacked proper PAS Approval.  The large majority of these residents were younger individuals or individuals with psychiatric issues.

52.     Of the twenty-four residents who lacked proper PAS Approval, five examples include:

a.  **Resident D.R.** – Resident D.R. was admitted into the facility on November 10, 2014 without PAS Approval.  Resident D.R. applied for—but was denied—PAS Approval in March 2015.  As of August 2016, when Relator's employment was terminated, Resident D.R. continued to reside at and receive therapy from the facility, and Signature Health – Fort Wayne continued to bill Medicaid fraudulently for services provided to Resident D.R.

b.  **Resident W.T.** – Resident W.T. was admitted to the facility on February 22, 2016.  Resident W.T. received a short-term 60-day PAS Approval on March 17, 2016.  Resident W.T.'s PAS Approval expired on April 22, 2016, but Resident W.T. was not discharged until July 11, 2016.  Signature Health – Fort Wayne was permitted to bill the government for therapy and services provided to Resident W.T. until *April 22, 2016.*  Despite this, Resident W.T. remained in the facility until July 2016 and Signature Health – Fort Wayne fraudulently billed the government until his discharge.

c.  **Resident M.M.** – Resident M.M. was admitted to the facility on December 9, 2015.  Resident M.M. did not receive temporary PAS Approval until February 26, 2016, yet Signature Health – Fort Wayne fraudulently billed the government for services and therapy provided to Resident M.M. from December 9, 2015 until February 26, 2016.  Upon receiving temporary PAS Approval, Resident M.M. was permitted to remain in the facility until June 6, 2016.  As of August 2016 when Relator's employment was terminated, Resident M.M. remained in the facility despite the expiration of his PAS Approval and Signature Health – Fort Wayne continued to fraudulently bill the government for services and therapy provided to Resident M.M.

d.  **Resident A.K.** – Resident A.K. was admitted to the facility on March 10, 2016 and was discharged on May 3, 2016.  Resident A.K. did not receive PAS

19

Approval, but Signature Health – Fort Wayne fraudulently billed the government for services and therapy provided to Resident A.K. during that time.

e. **Resident E.L.** – Resident E.L. was admitted to the facility on April 8, 2016 and was discharged on April 29, 2016. Resident E.L. did not receive PAS Approval, but Signature Health – Fort Wayne fraudulently billed the government for services and therapy provided to Resident E.L. during that time.

53.     On or after the day that the internal audit was concluded, Jane Doe 3 contacted an official at a local PAS Agency via e-mail to inquire into the PAS requirements and confirm what the requirements were.

54.     In her e-mail response to Jane Doe 3, the official at the PAS Agency stated that nursing facilities *must* conduct preadmission screenings of all new residents *prior to admission*, and *cannot bill Medicare* for residents unless they do so. The PAS official also confirmed that no residents at Signature Health – Fort Wayne were waiting on approval or appeal from the PAS office at that time. And finally, the PAS official explained that the submission of claims by nursing facilities for Medicare reimbursements operates on the honor system, and that, by submitting a claim for reimbursement, the facilities certify that its residents have received PAS Approval.

55.     Accordingly, Relator's internal audit, combined with the official at the PAS Agency's e-mail response to Jane Doe 3's inquiries demonstrate that Signature Health – Fort Wayne improperly and wrongfully was billing Medicare for a minimum of these twenty-four patients in June 2016. Because Relator learned that her sample was representative of the conduct for preadmission screening and other billing at this facility, Relator alleges that the Defendant is and has been improperly billing the government since at least 2010. Upon information and belief, similar fraudulent conduct is and has been occurring since at least 2010 at all 143 Signature Health facilities.

20

56.     Due to the fraudulent billing for the ineligible and medically unnecessary nursing facility services administered to ineligible individuals, Signature Health—Fort Wayne alone likely receives more than $5,000,000 annually, including: $6,000/month (room and board per patient) + $10,000-$15,000/month (individual therapy per patient) + $100/day (IV medication per patient), multiplied by the 20 – 30 patients who lack PAS Approval.

57.     Upon information and belief, with 142 other Signature Health facilities similarly billing Medicare for patients who lack PAS Approval, ***Defendant wrongfully receives over $100,000,000 of federal and state funds annually***.

58.     After reporting the results of the internal audit, Relator was asked by John Doe 1 to "keep quiet" about the lack of PAS Approval paperwork as John Doe 1 indicated that he would work with the regional team to correct the issue.

59.     Relator never heard anything from John Doe 1 nor anyone on the regional team regarding the audit results.

60.     Instead, in mid to late August 2016, Signature Health held a corporate-wide meeting at its Fort Wayne facility with its top personnel, including its Regional Vice President and Chief Compliance Officer, to discuss, among other issues, Signature Health – Fort Wayne's dire financial situation.  At a related meeting for employees, Relator again raised the issue of billing Medicare for residents who are not permitted to be at the facility (or for which the facility cannot bill Medicare) due to their lack of preadmission screening.  The superiors leading the meeting immediately changed the subject.

61.     Shortly thereafter, on August 26, 2016, Signature Health – Fort Wayne terminated Ms. Hannie's employment.  Upon information and belief, her termination was directly tied to her raising the issue of the fraudulent billing of Medicare.

## COUNT I
## VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A)

62.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

63.     As set forth above, from at least 2010 through the present, Defendant presented false or fraudulent claims for payment, or knowingly caused false or fraudulent claims for payment to be presented, to officials of the United States Government in violation of 31 U.S.C. § 3729(a)(1)(A).

64.     By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendant, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT II
## VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(B)

65.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

66.     As set forth above, from at least 2010 through the present, Defendant knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).  Defendant knowingly and falsely certified that its claims for reimbursement complied with all applicable Medicaid laws and regulations.

67.     By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendant, the United States suffered actual damages and therefore is entitled to multiple

damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT III
### VIOLATION OF THE FLORIDA FALSE CLAIMS ACT
### Fla. Stat. § 68.082(2)(a)

68.     Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

69.     This is a claim for penalties and treble damages under the Florida False Claims Act.

70.     By virtue of the acts described above, Defendant, for the purpose of defrauding the Florida State Government, knowingly, with deliberate ignorance, or with reckless disregard or intentionally made, and/or caused to be made, false statements or representations of material facts on applications for contracts, benefits, or payments under the Medicaid and other Florida State funded program, within the meaning of Fla. Stat. § 68.082(2)(a).

71.     As a result, Florida State monies were lost through payments made in respect of the false statements or representations and other costs were sustained by the Florida State Government.

72.     Therefore, the Florida State Government has been damaged in an amount to be proven at trial.

73.     Additionally, the Florida State Government is entitled to the maximum penalty for each and every unlawful act committed by Defendant and arising from its fraudulent conduct as described herein.

## COUNT IV
### VIOLATION OF THE FLORIDA FALSE CLAIMS ACT
### Fla. Stat. § 68.082(2)(b)

74.     Relator incorporates by reference the allegations set forth in the preceding

23

paragraphs as though fully set forth herein.

75.     This is a claim for restitution, interest, penalties and double damages under the Florida False Claims Act.

76.     By virtue of the acts described above, Defendant, for the purpose of defrauding the Florida State Government, knowingly, with deliberate ignorance, or with reckless disregard or intentionally made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved under Medicaid and other Florida State funded programs within the meaning of Fla. Stat. § 68.082(2)(b).

77.     As a result, Florida State monies were lost through payments made in respect of the false statements or representations and other costs were sustained by the Florida State Government.

78.     Therefore, the Florida State Government has been damaged in an amount to be proven at trial.

79.     Additionally, the Florida State Government is entitled to the maximum penalty for each and every unlawful act committed by Defendant's fraudulent conduct as described herein.

## COUNT V
## VIOLATION OF THE GEORGIA STATE FALSE MEDICAID CLAIMS ACT
### Ga. Code Ann. § 49-4-168.1(a)(1)

80.     Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

81.     This is a claim for penalties and treble damages under the Georgia State False Claims Act.

82.     By virtue of the acts described above, Defendant, for the purpose of defrauding the Georgia State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented to the Georgia Medicaid program false or fraudulent

24

claims for payment or approval within the meaning of Ga. Code. Ann. § 49-4-168.1(a)(1).

83. As a result, Georgia State monies were lost through payments made in respect of the claims and other costs were sustained by the Georgia State Government.

84. Therefore, the Georgia State Government has been damaged in an amount to be proven at trial.

85. Additionally, the Georgia State Government is entitled to the maximum penalty for each and every false or fraudulent claim presented and caused to be presented by Defendant and arising from its fraudulent conduct as described herein.

## COUNT VI
## VIOLATION OF THE GEORGIA STATE FALSE MEDICAID CLAIMS ACT
### Ga. Code Ann. § 49-4-168.1(a)(2)

86. Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

87. This is a claim for penalties and treble damages under the Georgia State False Claims Act.

88. By virtue of the acts described above, Defendant, for the purpose of defrauding the Georgia State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to obtain payment or approval of claims by the State of Georgia within the meaning of Ga. Code Ann. § 49-4-168.1(a)(2).

89. As a result, Georgia State monies were lost through payments made in respect of the claims and other costs were sustained by the Georgia State Government.

90. Therefore, the Georgia State Government has been damaged in an amount to be proven at trial.

91. Additionally, the Georgia State Government is entitled to the maximum penalty

for each and every false or fraudulent claim paid or approved arising from Defendant's fraudulent conduct as described herein.

## COUNT VII
### VIOLATION OF THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT
### Ind. Code § 5-11-5.5-2(b)(1) and (8)

92.     Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

93.     This is a claim for penalties and treble damages under the Indiana False Claims and Whistleblower Protection Act.

94.     By virtue of the acts described above, Defendant, for the purpose of defrauding the California State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false claims for payment or approval under Medicaid and other Indiana State funded programs to officers or employees of the state within the meaning of Ind. Code § 5-11-5.5-2(b)(1) and (8).

95.     As a result, Indiana State monies were lost through payments made in respect of the claims and other costs were sustained by the Indiana State Government.

96.     Therefore, the Indiana State Government has been damaged in an amount to be proven at trial.

97.     Additionally, the Indiana State Government is entitled to the maximum penalty for each and every false claim presented and caused to be presented by Defendant and arising from its fraudulent conduct as described herein.

## COUNT VIII
### VIOLATION OF THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT
### Ind. Code § 5-11-5.5-2(b)(2) and (8)

98.     Relator incorporates by reference the allegations set forth in the preceding

paragraphs as though fully set forth herein.

99.     This is a claim for penalties and treble damages under the Indiana False Claims and Whistleblower Protection Act.

100.    By virtue of the acts described above, Defendant, for the purpose of defrauding the Indiana State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other Indiana State funded programs within the meaning of Ind. Code. § 5-11-5.5-2(b)(2) and (8).

101.    As a result, Indiana State monies were lost through payments made in respect of the claims and other costs were sustained by the Indiana State Government.

102.    Therefore, the Indiana State Government has been damaged in an amount to be proven at trial.

103.    Additionally, the Indiana State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from Defendant's fraudulent conduct as described herein.

## COUNT IX
### MARYLAND FALSE CLAIMS ACT
#### MD. Code Ann., Health – Gen.,§ 2-602(a)(1)

104.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

105.    This is a claim for penalties and treble damages under the Maryland False Claims Act.

106.    By virtue of the acts described above, Defendant, for the purpose of defrauding the Maryland State Government, knowingly, with deliberate ignorance, or with reckless

disregard made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other Maryland State funded programs within the meaning of MD. Code Ann., Health – Gen., § 2-602(a)(1).

107.    As a result, Maryland State monies were lost through payments made in respect of the claims and other costs were sustained by the Maryland State Government.

108.    Therefore, the Maryland State Government has been damaged in an amount to be proven at trial.

109.    Additionally, the Maryland State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from Defendant's fraudulent conduct as described herein.

### COUNT X
### MARYLAND FALSE CLAIMS ACT
### MD. Code Ann., Health – Gen., § 2-602(a)(2)

110.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

111.    This is a claim for penalties and treble damages under the Maryland False Claims Act.

112.    By virtue of the acts described above, Defendant, for the purpose of defrauding the Maryland State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other Maryland State funded programs within the meaning of MD. Code Ann., Health – Gen., § 2-602(a)(2).

113.    As a result, Maryland State monies were lost through payments made in respect of the claims and other costs were sustained by the Maryland State Government.

28

114.   Therefore, the Maryland State Government has been damaged in an amount to be proven at trial.

115.   Additionally, the Maryland State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from Defendant's fraudulent conduct as described herein.

**COUNT XI**
**VIOLATION OF THE NORTH CAROLINA FALSE CLAIMS ACT**
**N.C. Gen. Stat. § 1-607(a)(1)**

116.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

117.   This is a claim for penalties and treble damages under the North Carolina False Claims Act.

118.   By virtue of the acts described above, Defendant, for the purpose of defrauding the North Carolina State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other North Carolina State funded programs within the meaning of N.C. Gen .Stat. § 1-607(a)(1).

119.   As a result, North Carolina State monies were lost through payments made in respect of the claims and other costs were sustained by the North Carolina State Government.

120.   Therefore, the North Carolina State Government has been damaged in an amount to be proven at trial.

121.   Additionally, the North Carolina State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from Defendant's fraudulent conduct as described herein.

29

## COUNT XII
## VIOLATION OF THE NORTH CAROLINA FALSE CLAIMS ACT
### N.C. Gen. Stat. § 1-607(a)(2)

122.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

123.    This is a claim for penalties and treble damages under the North Carolina False Claims Act.

124.    By virtue of the acts described above, Defendant, for the purpose of defrauding the North Carolina State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other North Carolina State funded programs within the meaning of N.C. Gen. Stat. § 1-607(a)(2).

125.    As a result, North Carolina State monies were lost through payments made in respect of the claims and other costs were sustained by the North Carolina State Government.

126.    Therefore, the North Carolina State Government has been damaged in an amount to be proven at trial.

127.    Additionally, the North Carolina State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from Defendant's fraudulent conduct as described herein.

## COUNT XIII
## VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS
### Tenn. Code Ann. § 4-18-103(a)(1)

128.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

129.    This is a claim for penalties and treble damages under the Tennessee False Claims

Act.

130.    By virtue of the acts described above, Defendant, for the purpose of defrauding the Tennessee State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other Tennessee State funded programs within the meaning of Tenn. Code Ann. § 4-18-103(a)(1).

131.    As a result, Tennessee State monies were lost through payments made in respect of the claims and other costs were sustained by the Tennessee State Government.

132.    Therefore, the Tennessee State Government has been damaged in an amount to be proven at trial.

133.    Additionally, the Tennessee State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from Defendant's fraudulent conduct as described herein.

## COUNT XIV
## VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT
### Tenn. Code Ann. § 4-18-103(a)(2)

134.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

135.    This is a claim for penalties and treble damages under the Tennessee False Claims Act.

136.    By virtue of the acts described above, Defendant, for the purpose of defrauding the Tennessee State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other Tennessee State funded programs within the

31

meaning of Tenn. Code Ann. § 4-18-103(a)(2).

137. As a result, Tennessee State monies were lost through payments made in respect of the claims and other costs were sustained by the Tennessee State Government.

138. Therefore, the Tennessee State Government has been damaged in an amount to be proven at trial.

139. Additionally, the Tennessee State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from Defendant's fraudulent conduct as described herein.

### COUNT XV
### VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT
### Tenn. Code Ann. § 71-5-182(a)(1)(A)

140. Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

141. This is a claim for penalties and treble damages under the Tennessee Medicaid False Claims Act.

142. By virtue of the acts described above, Defendant, for the purpose of defrauding the Tennessee State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the state knowing such record or state were false within the meaning of Tenn. Code Ann. § 71-5-182(a)(1)(A).

143. As a result, Tennessee State monies were lost through payments made in respect of the claims and other costs were sustained by the Tennessee State Government.

144. Therefore, the Tennessee State Government has been damaged in an amount to be proven at trial.

145.     Additionally, the Tennessee State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from Defendant's fraudulent conduct as described herein.

### COUNT XVI
## VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT
### Tenn. Code Ann. § 71-5-182(a)(1)(B)

146.     Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

147.     This is a claim for penalties and treble damages under the Tennessee Medicaid False Claims Act.

148.     By virtue of the acts described above, Defendant, for the purpose of defrauding the Tennessee State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the state knowing such record or statement were false within the meaning of Tenn. Code Ann. § 71-5-182(a)(1)(B).

149.     As a result, Tennessee State monies were lost through payments made in respect of the claims and other costs were sustained by the Tennessee State Government.

150.     Therefore, the Tennessee State Government has been damaged in an amount to be proven at trial.

151.     Additionally, the Tennessee State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from Defendant's fraudulent conduct as described herein.

## COUNT XVII
## VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT
### Tenn. Code Ann. § 71-5-182(a)(1)(D)

152.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

153.    This is a claim for penalties and treble damages under the Tennessee Medicaid False Claims Act.

154.    By virtue of the acts described above, Defendant, for the purpose of defrauding the Tennessee State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the state knowing such record or statement were false within the meaning of Tenn. Code Ann. § 71-5-182(a)(1)(D).

155.    As a result, Tennessee State monies were lost through payments made in respect of the claims and other costs were sustained by the Tennessee State Government.

156.    Therefore, the Tennessee State Government has been damaged in an amount to be proven at trial.

157.    Additionally, the Tennessee State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from Defendant's fraudulent conduct as described herein.

## COUNT XVIII
## VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### Va. Code Ann. § 8.01-216.3(A)(1)

158.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

159.    This is a claim for penalties and treble damages under the Virginia Fraud Against

Taxpayers Act.

160.    By virtue of the acts described above, Defendant, for the purpose of defrauding the Virginia Commonwealth Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other Tennessee Commonwealth funded programs within the meaning of Va. Code. Ann. § 8.01-216.3(A)(1).

161.    As a result, Virginia Commonwealth monies were lost through payments made in respect of the claims and other costs were sustained by the Virginia Commonwealth Government.

162.    Therefore, the Virginia Commonwealth Government has been damaged in an amount to be proven at trial.

163.    Additionally, the Virginia Commonwealth Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from Defendant's fraudulent conduct as described herein.

**COUNT XIX**
**VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT**
**Va. Code Ann. § 8.01-216.3(A)(2)**

164.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

165.    This is a claim for penalties and treble damages under the Virginia Fraud Against Taxpayers Act.

166.    By virtue of the acts described above, Defendant, for the purpose of defrauding the Virginia Commonwealth Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false

claims paid or approved under Medicaid and other Tennessee Commonwealth funded programs within the meaning of Va. Code. Ann. § 8.01-216.3(A)(3).

167.   As a result, Virginia Commonwealth monies were lost through payments made in respect of the claims and other costs were sustained by the Virginia Commonwealth Government.

168.   Therefore, the Virginia Commonwealth Government has been damaged in an amount to be proven at trial.

169.   Additionally, the Virginia Commonwealth Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from Defendant's fraudulent conduct as described herein.

## PRAYER FOR RELIEF

WHEREFORE, the United States and Relator demand that judgment be entered against Defendant and in favor of the Relator and the United States as follows:

173.   On the first through nineteenth causes of action under the federal False Claims Act (and as amended and equivalent state statutes), for the amount of the United States' and the States' damages, multiplied by three as required by law, and such civil penalties as are permitted or required by law;

174.   That the Relator be awarded the maximum share amount allowed pursuant to 31 U.S.C. § 3730(d) and applicable State law;

175.   That the Relator be awarded all costs and expenses of this action, including attorney fees, expenses and costs as permitted by 31 U.S.C. § 3730(d) and applicable State law.

176.   That the United States, the States, and Relator receive all such other relief as may be just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Respectfully submitted,

*/s/ Steven C. Coffaro*
Steven C. Coffaro (19767-15)
Gregory M. Utter *
Joseph M. Callow, Jr. *
Keating Muething & Klekamp PLL
One East Fourth Street
Suite 1400
Cincinnati, Ohio 45202
Phone: (513) 579-6400
Fax: (513) 579-6457
steve.coffaro@kmklaw.com
gmutter@kmklaw.com
jcallow@kmklaw.com

*/s/ Joel D. Hesch*
Joel D. Hesch *
The Hesch Firm, LLC
3540 Ridgecroft Dr.
Lynchburg, Virginia  24503
Phone: (434) 592-4251

* *Pro hac vice applications forthcoming*

***Attorneys for Relator, Jessica Hannie***

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of November, 2016, a copy of the foregoing Complaint and the required Disclosure Statement were served via UPS, to the following:

Hon. Loretta Lynch
Attorney General of the United States
950 Pennsylvania Avenue, NW
Room 4400
Washington, D.C. 20530-0001

Hon. David A. Capp
United States Attorney for the Northern District of Indiana

37

United States Attorney's Office
5400 Federal Plaza, Suite 1500
Hammond, Indiana 46320

/s/ Steven C. Coffaro
Steven C. Coffaro (19767-15)

7128963.3